## Allison and Evans' Appeal.

## Porterfield and Treat's Appeal.

1. Oil land described by metes and bounds with a " protection " of eight rods on the north side and ten rods on the east side, was leased to Evans. *Held*, that the " protection " extended to the point where the lines on the respective sides of the land would intersect.

2. Oil land on the northeast corner of Evans' lease was leased to Treat, who sunk a well within the " protection," injuring Evans' wells on his land. *Held*, that Treat could be restrained from operating on the " protection," and that in the same proceeding damages could be assessed against him for the injury.

3. As a general principle, when a court of equity has obtained jurisdiction for one purpose, it may retain it generally for relief; as well in cases of continuing trespass and waste as in cases of fraud, accident, mistake and account.

4. To prevent multiplicity of suits, a court of equity will decree an account of the damages or waste at the same time with an injunction, and make a decree to settle the entire controversy.

October 23d 1874. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR and GORDON, JJ.

Appeals from the Court of Common Pleas of *Clarion county:*

In Equity: No. 176 and 179, to October and November Term 1874.

The bill in this case was filed July 1st 1872 by J. W. Allison and A. Evans, against R. W. Porterfield and M. C. Treat. ·

It set out that Joseph Foust, on the 15th of July 1871, leased for twenty years to Philip Foust and William Spencer, by metes and bounds, which were stated in the bill, a lot of ground containing 3 acres and 123 perches of land, "for the sole and only purpose of mining and excavating for petroleum, coal, rock or carbon oil," and also a "protection of 10 rods on the east side" of the lot, "and 8 rods on the north side;" the lessees to deliver to the lessor one-eighth of the petroleum, &c., raised on the premises; the lessor to use the premises for tillage, except such part as may be necessary for mining purposes, and a right of way to the places of mining, &c.; that on the 29th of March 1872 the lessees transferred their interest in the lease unto A. Evans, one of the plaintiffs, and on the 19th of July 1872, Evans transferred seven-eighths to J. W. Allison, the other plaintiff; that the defendants had entered on "the protection," and after notice from the plaintiffs to desist, had erected machinery on "the protection," and "were boring and drilling thereon for carbon and petroleum, in violation of said notice and the rights of the plaintiffs."

The prayers were:—

1. For an injunction.

2. For an account of all waste, &c., "and in the event of their obtaining oil prior to the judicial determination of this case, to account for all oil so obtained from the premises."

The defendants answered, that they entered on the land mentioned in the bill under a lease from Joseph Foust, the plaintiffs' lessor, and denied that they were in "the protection" set out in the bill; they averred that the land leased by them from Joseph Foust lies northeast of the northeast corner of the plaintiffs' leasehold; that their lease from Joseph Foust was bounded by lines which were merely an extension of plaintiffs' north and east lines beyond their northeast corner; they further averred that they believed that the land leased to them was not covered by "the protection" mentioned in the bill, and that they were advised as matter of law that "the protection" did not extend to any land included in their lease.

The question as to the land within "the protection" was, whether the north and east lines of "the protection" were to be extended until they met, or whether "the protection" on the north side extended no farther than to the east line of the leased land, and on the east side no farther than to the north line of the leased land; in the latter case the defendants might sink wells, &c., immediately outside of plaintiffs' leasehold.

The annexed diagram may more clearly indicate the respective claims of the parties:—

[Allison and Evans' Appeal.]

Porterfield and Treat's Leasehold.

Part in dispute.

E.

Protection, 10 rods, East.

N.

S.

Protection, 8 rods, North.

Allison and Evans' Leasehold.

W.

[Allison and Evans' Appeal.]

James Boggs, Esq., was appointed examiner and master. He took testimony in the case and as master reported, amongst other things, that the plaintiffs commenced sinking an oil-well on the premises leased to them, and completed it on the 14th of January 1872 ; the well produced from 90 to 100 barrels of oil daily ; that on the 28th of March 1872, Joseph Foust leased to the defendants a lot lying northeast from plaintiffs' lot, containing about two acres, and shortly afterwards commenced sinking a well on the disputed part.

The plaintiffs commenced a second well on their lot, which was completed July 15th 1872, and produced about 50 barrels of oil daily. The defendants' well was completed about the middle of August 1872, and then produced about 65 barrels of oil daily. The product of oil from the plaintiffs' wells decreased, and at the hearing before the master the aggregate product of both their wells was about 16 barrels daily. He also reported the amount of oil which the defendants had obtained from their well, its value, &c. ; that the sinking of the well was an injury to the plaintiffs, and that the amount of damages was one-half of the whole production of the well.

He further reported his opinion in the case as follows :—

* * * " This protection was to prevent Joseph Foust or any other person under him from putting down an oil-well at any place within the prescribed limits. At no place could Joseph Foust, or any other person under him, put down a well on the north side of this Evans and Allison lease within 8 rods of the actual line thereof, nor on the east side within 10 rods ; nor could Evans and Allison bore at any place within their protection outside of the actual lines of their lease, but could bore up as near their lines as they could erect their buildings for the purpose. The chief object of this protection appeared to be to secure to the lessees the exclusive chance for oil under their lease, or at least in so far as 8 rods additional north and 10 rods on the east would do that. As to whether the protection extended around the corner, the language of the agreement is somewhat ambiguous and doubtful, which ambiguity and doubt are to be taken most strongly against the lessor, Joseph Foust, and his subsequent lessees with notice. * * * It is our opinion that the intention of the parties at the making of the lease was to secure to it the same protection at the corner as at the sides, and that the protection lines at the northeast corner extended until they intersect each other. * * * If we are correct in our interpretation, the well of Porterfield and Treat is within the plaintiffs' protection." * * *

The master found also that the entire production from defendants' well to July 19th 1873 was $18,777.79, and therefore $9388.89 would be the measure of damages to the plaintiffs.

He therefore recommended a decree in favor of plaintiffs for

$9388.89, and for an injunction to restrain defendants from further damage to the plaintiffs' leasehold.

The defendants filed exceptions to the report: that the master erred in not holding that the bill laid no ground for equitable relief; that a bill for an account would not lie, the remedy being at law; and in finding that the defendants' well was within "the protection" mentioned in the plaintiffs' bill. There were exceptions also as to the amount of damages and the mode of computation.

The court (Jenks, P. J.) overruled the exceptions as to the right of the plaintiffs to an injunction to restrain the defendants from further operations on the premises in dispute, and decreed an injunction accordingly; and sustained the exceptions as to the question of damages as not being cognisable in equity, and as to that dismissed the bill without prejudice.

Both parties appealed to the Supreme Court, and assigned for error the portions of the decree against them respectively.

*Knox & Maffett* and *J. Campbell*, for Allison and Evans.—A constantly-recurring trespass may be redressed in equity by injunction: Stewart's Appeal, 6 P. F. Smith 422; Brightly's Equity, §§ 294, 295; Scott v. Burton, 2 Ashmead 325. Awarding compensation in damages by a court of equity is incident to the grant of an injunction: Hilliard on Injunction 331, pl. 9; 3 Daniel's Ch. Pr. 189, pl. 319; Masson's Appeal, 20 P. F. Smith 26.

*D. Lawson* and *W. S. Corbett*, for Porterfield and Treat.— The legislature has not given to the courts a general equity jurisdiction, and they cannot exceed that granted: Brightly's Equity, sect. 25; Gilder v. Merwin, 6 Whart. 522; Cassel v. Jones, 6 W. & S. 553; Hagner v. Heyberger, 7 Id. 106; Commonwealth v. Bank of Pennsylvania, 3 Id. 184. The parties in such cases must be left to their remedy at law: Dalzell v. Crawford, 1 Parsons 41. The equity powers of our courts extend only to cases where account is sustainable at law: Brightly's Equity, sect. 120; Shriver v. Nimick, 5 Wright 91; Persch v. Quiggle, 7 P. F. Smith 258.

Mr. Justice WILLIAMS delivered the opinion of the court, October 11th 1875.

This was a bill to restrain the defendants from boring for oil, and to account for the damage done to plaintiffs' leasehold, and for all oil obtained on the premises. The master found that the well bored by the defendants was within the "protection" stipulated for in the plaintiffs' lease, and that the damages occasioned thereby to the plaintiffs' leasehold amounted to one-half the entire production of the well from August 20th 1872 to July 19th 1873,

27 P. F. SMITH—15

the market price or value of which was $9388.89, and accordingly he recommended that a de'cree be entered in favor of the plaintiffs for the amount so found, and that an injunction be granted against the defendants to prevent further damage to the leasehold of the plaintiffs.

The court below, on exceptions filed by the defendants to the master's report, ordered a perpetual injunction to restrain the defendants from further operations upon the premises in dispute, and dismissed the bill as to plaintiffs' claim for damages without prejudice. Both parties have appealed from the decree; the defendants from the order awarding the injunction, and the plaintiffs from the order dismissing the bill.

The question presented by the defendants' appeal will be first 'considered. Are the plaintiffs then entitled to the injunction ?

If the stipulation in the lease, on which the right to the injunction depends, is to be strictly construed according to the literal meaning of the language, the defendants' well cannot be regarded as within the protection for which it provides, and if so, the plaintiffs have no legal or equitable right to the relief asked for in the bill. But the agreement must be construed with reference to the subject-matter, and so as to effectuate, if possible, the purpose for which it was intended. The lease was " for the sole and only purpose of mining and excavating for petroleum coal, rock or carbon oil " in the tract described therein. The parties probably knew that if oil was found in the demised premises, a well bored within a short distance would draw off more or less of the oil, and that for the same reason a well on the border or side of the tract would draw part of its supply from the adjoining ground. The object of the agreement was therefore twofold : to prevent the lessor or any one under him from mining or boring wells within eight rods of the north and ten rods of the east line of the tract described in the lease, and to give the lessors more ground for the supply of any wells they might drill or bore on the demised premises in proximity to these lines.

Is it then a reasonable supposition, that the parties intended to leave a gap at the corner where these lines intersect which would render the " protection" valueless and defeat the purpose for which it was intended ? If the north and east lines were to be protected, then every point in these lines must be protected; and if so, why should the parties leave at the corner, when they meet an open area ten rods long and eight rods wide, in which a well could be bored, as it was by the defendants, to the great damage and waste of the leasehold ? The master and the court below were of the opinion that it was the intention of the parties to secure the same protection to the corner as to the sides of the demised tract, and that the agreement should be so construed as to carry out their intention. This, as it seems to us, is its reasonable inter-

pretation; and if so, the defendants had no right to construct buildings and machinery and to put down a well within a few feet of the corner of the plaintiffs' leasehold, and pump therefrom, as they did, large quantities of oil. Nor can there be a doubt that the plaintiffs have a sufficient title to enable them to obtain redress by injunction of the wrong done by the defendants. The trespass of which they complain is of a permanent nature, and, under the facts found by the master, destructive of their leasehold. It is clear then that, under the equitable powers conferred by the statute, the court below had jurisdiction for its prevention or restraint: Stewart's Appeal, 6 P. F. Smith 413; Smith's Appeal, 19 Id. 474; Masson's Appeal, 20 Id. 26. The defendants' appeal must therefore be dismissed.

We come now to the question presented by the plaintiffs' appeal. Are they entitled to a decree for the damages found by the master? The court below refused to make such decree, on the ground that the plaintiffs' remedy was in a court of common-law jurisdiction, and not in a court of equity. But it is well settled, as a general principle, that where a court of equity has obtained jurisdiction for one purpose it may retain it generally for relief.

This seems to be the rule, not only when the jurisdiction attaches for discovery in cases of fraud, accident, mistake and account, but where it attaches for injunction in cases of continuing trespass and waste. In such cases the course is to sustain a bill for the purpose of injunction, connecting it with the account, and not compel the plaintiff to go into a court of law for damages: Thomas v. Oakley, 18 Vesey 184. To prevent multiplicity of suits, the court will decree an account of the damages or waste done at the same time with an injunction, and proceed to make a complete decree, so as to settle the entire controversy between the parties. This is the doctrine not only of courts of equity having general chancery jurisdiction, but of this court, under the equitable powers conferred by the legislature. The principle was asserted and applied in McGowin v. Remington, 2 Jones 56, and it has been recognised and reaffirmed in subsequent cases: Souder's Appeal, 7 P. F. Smith 498; Coleman's Appeal, 25 Id. 441; Masson's Appeal, 20 Id. 26. Why then should we hold that the power of the court for relief ceased with the injunction? If the statutes giving chancery powers in injunctions and matters of account do not, as contended, expressly give the power to decree damages against tort-feasors, they give, in express terms, " power and jurisdiction of courts of chancery so far as relates to the prevention or restraint of the commission or continuance of acts contrary to law and prejudicial to the rights of individuals." If, incident to the right of injunction in such cases, courts of chancery decree an account of the damages or waste done, is it an unreasonable construction of the statute to hold that the legislature, in giving the power and juris-

[Allison and Evans' Appeal.]

diction which it confers, intended that it should be exercised as fully and with the same incidents as it is by courts of chancery in like cases ? There is no more difficulty in taking an account of the damages in cases of waste and continuing trespass, than there is in settling a partnership or other account or claim of which equity has jurisdiction. The court below was therefore in error in deciding that it had no jurisdiction in equity of the plaintiffs' damages, and dismissing their bill so far as it asks for an account, and in this respect the decree must be reversed.

And now, October 11th 1875, it is ordered, adjudged and decreed, that the defendants' appeal be dismissed, and that so much of the decree in this case as orders a perpetual injunction to issue to restrain the defendants from further operations, &c., and that they pay the costs of this case, be affirmed; and that the residue of the said decree, dismissing the bill as to the plaintiffs' right to recover damages for the money complained of, be reversed and set aside. And it is further ordered, adjudged and decreed, that the defendants pay to the plaintiffs the sum of $9388.89, being the amount of the damages to the plaintiffs' leasehold by the defendants' well, as found by the master, with interest thereon from the 24th of November 1873, the date of filing his report; and it is further ordered, that the defendants pay the costs of their own and of the plaintiffs' appeal, to be taxed by the prothonotary, and the record be remitted to the court below for the purpose of enforcing and executing this decree.